## Oyer and Terminer—New York County.

*July,* 1873.

## PEOPLE *v.* WALWORTH.

MURDER—PREMEDITATION AND DELIBERATION—LAWS 1873, CHAP. 644—JUSTIFIABLE HOMICIDE—3 R. S. 7TH ED. P. 2473, § 3—INSANITY.

To constitute murder in the first degree under the first subdivision of section 5 of the act of April 12, 1862, as amended by chapter 644, Laws of 1873, something more than the actual presence of intention formed at the instant of the striking of the blow or firing the shot, is necessary. There must be a deliberate and premeditated design to effect death, distinguishable from a suddenly formed intention without deliberation and premeditation.

It must, in such case, appear that there was some actual deliberation and premeditation operating in and upon the mind of the accused in respect to the subject matter of the offense, before the actual occurrence of the fact which is alleged to be criminal.

Under the statute, the alleged deliberate and premeditated design is left open as a question of fact always for the consideration of the jury, and the court has no power or right to decide as a question of law whether the evidence presented does or does not establish facts which constitute deliberation or premeditation.

In the application of the rule to any given case, jurors are called upon to exercise their knowledge of human nature in its various developments and characteristics, and to consider that what would be deliberation and premeditation in one man might fall far short of being such in another.

Under this statute it being only required that it shall be satisfactorily shown to the jury that the act was a deliberate and premeditated one, it is only necessary that the jury should see that under the given circumstances of the particular case, the particular individual did, in his mind, go through the process of deliberation and premeditation reaching the intention—the intention flowing from that process—which the statute requires.

No strict rule can be laid down by the courts as to the character or amount of evidence necessary to show the existence of a deliberate and premeditated design to effect death. Each case must depend upon its own facts and circumstances; and while one case may be proved by a long train of circumstances and events, another may be shown by a few

sharp and startling facts, and in still another the jury may find in the very act of killing, in the manner in which it was done, the weapon used, the number of blows and wounds, the time and place where effected, the disposition of the victim, and the objects accomplished, everything requisite to satisfy them of the presence of deliberation and premeditation as components of the crime.

It makes no difference that the deliberate and premeditated intent was an alternative one, and that the prisoner carried in his mind, also, the hope and prospect of consummating an arrangement with his victim not involving the killing of him. If the prisoner at the same time entertained the resolve that he would kill the deceased, if he could not consummate such arrangement, then the act of killing in pursuance of such resolve is murder in the first degree.

In order to constitute murder in the second degree, it is necessary, under said statute, that there should be at the time of firing the fatal shot, an intent to kill. Shots fired by accident or with a design not to kill, but to injure and wound, or fired for the purpose of frightening a party, are not within this statute, which requires the actual presence of existing intention; but the statute does not require that the intention should be the result of pre-deliberation; it may be formed upon the instant; it may be the result of that instantaneous action of the mind when from some cause arising upon the moment the thought flashes into the mind, "I will kill," and the act follows the thought, but the jury must be able to find from the facts and circumstances of a given case, that that thought became an intent, consummated by an act resulting in death, in order to constitute the crime.

The general bad character of a person slain can neither tend to show that the defendant is not guilty of homicide, or in any sense to mitigate the taking of human life.

One accused of parricide is entitled to the same protection of the law in acting in self-defence against and upon his father, as he would be in acting against and upon any other individual; nor are the jury to give less weight to his exculpatory evidence, where he produces it, than if he had produced the same evidence, having killed a stranger.

The provisions of the Revised Statutes (3 *R. S.* 7th ed. p. 2473, § 3, subds. 1, 2), in regard to justifiable homicide, relate to a transaction occurring in respect of parties present at the time and place of its occurrence, and have no application to a case where there is an allegation of danger to an absent person. Accordingly, if defendant. animated by threats against one of the persons mentioned in the statute, *e. g.*, his mother, shot down another for such threats, and because he thought they might at some future day be executed, the person against whom the threats were directed not being then present, he has no justification under said statute.

When one who is without fault himself is attacked by another in such manner and under such circumstances as to furnish reasonable ground for apprehending a design to take away his life, or to do some great bodily harm, and there is reasonable ground for believing the danger immi-

nent—that such design will be accomplished—he may safely act upon appearances and kill the assailant, and the killing will be justifiable, although it may turn out afterwards that the appearance was false, and that there was in fact neither design to do him serious injury, nor danger that it would be done.

Under said statute, the killing of another is justifiable homicide if there is reasonable ground to apprehend, at the time of the killing, a design on the part of the person killed to commit a felony, or to do some great personal injury, and the belief that the danger is imminent—that such design will be accomplished—and it is for the jury to determine, upon all the facts presented to them, whether or not those essential elements existed at the time.

The declarations of one accused of murder, made in the form of a statement on an inquest before the coroner, when considered by the jury upon the trial, are to be presumed to have been made as favorable to himself as truth would permit.

In considering whether the accused, in perpetrating the killing, acted upon a belief that there was reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished, the jury are to take into consideration the fact, if it be in the case, that the deceased was invited by the prisoner to the interview at which the killing took place.

The true rule in such case is, that where the invitation comes from the person who kills, and the person killed is brought into his presence and there slain while alone, there being enmity between them, or there having been threats on the part of the person killed as respects the person who kills, a careful investigation by the jury is required to see whether or not the person who slays was in the position required by the statute in order to justify the offense.

In such a case, the jury have a right to look at antecedent threats that are alleged to have been made against the prisoner for the purpose of determining whether his mind, in reaching these conclusions, was operated upon by those threats, and the threats were of such a character as may justly be said to have justified his mind in reaching more readily the conclusion which justified the killing under the statute.

When a person comes into the presence of another, having threatened his life, and does acts indicating an intention to take that life, the party has a right in putting himself on his guard, not only to consider the present acts, but to give character to those present acts through the medium of the antecedent threats.

The rule in this State in regard to insanity, as a defense against crime, is as follows : If it be satisfactorily shown that the accused, at the time of committing the act, had not the capacity to understand what he was doing, and know the consequences of his act, and know that it was wrong, then he is excused. But if he had capacity sufficient, in the judgment of the jury, to know the legal and moral character of the act he was doing, the fact that he alleges that he had not the control of

his will in respect to it, but that his will was controlled by irresistible impulse, is no defense.

TRIAL of an indictment for murder in the first degree.

The defendant, Frank H. Walworth, was indicted June 9, 1873, in the Court of Oyer and Terminer of New York county, for the killing of his father, Mansfield Tracy Walworth, June 3, 1873, and on June 24, and thereafter till July 2, 1873, was tried in said court, the Hon. NOAH DAVIS, presiding.

*Benjamin K. Phelps,* district attorney (*Daniel G. Rollins,* assistant), for the people.

*Charles O'Connor* and *William A. Beach,* of counsel, for the prisoner.

The court charged the jury as follows:

DAVIS, J.—Gentlemen of the jury: The prisoner at the bar stands indicted for the crime of murder in the first degree. That crime has long been defined in this State by statute; but on the 29th day of May, only a few days before the occurrence of the act upon which the present charge is based, the Legislature of this State passed a law altering, in material respects, the then existing statute on the subject of murder.* The prisoner is on trial under the new statute. This is the first occasion a court has been called upon to construe the new statute, and give to a jury instructions relative to its application to any case. I shall proceed, briefly, first to perform that duty. Prior to this statute it had long been settled, under the existing law, that whenever the unlawful killing of a human being was done with a clear and well-defined intent to effect death, it was murder in the first degree; and that although the intent to kill was formed upon the instant of striking the blow, or firing the shot which occasioned death, the premeditation would be sufficient, if the jury found, from the facts laid before them, an actual de-

---

* Laws of 1873, chapter 644; now substantially embodied in the Penal Code, § 183.

sign to destroy life preceding or accompanying the fatal act. Many cases in the books are to be found holding that doctrine. The language of the statute, prior to the present law, under which the prisoner is upon trial, was in the words which I now read to you :

"Such killing, unless it be manslaughter or excusable or justifiable homicide, as hereinafter provided, shall be murder in the first degree, in the following cases :

"*First.* When perpetrated from a premeditated design to effect the death of the person killed, or of any human being."

Thus stood the statute on the 29th of May. On that day, as I have already stated, the Legislature enacted another, and as I feel constrained to instruct you, a very materially different statute in some important respects. They altered the statute in the first subdivision, which I have just read to you, so that, instead of reading, "when perpetrated from a *premeditated design* to effect the death of the person killed," it now reads, "when perpetrated from a *deliberate and premeditated design*" to effect death.

The elementary books speak of intentional murder as deliberate murder. · They seem to regard the presence of malice (actual malice included in the intention to destroy life) as conclusive evidence of deliberation and premeditation. Some embarrassment might, therefore, have arisen in construing this statute, from the fact that it might have been held that the Legislature, in using the word "deliberate" in connection with this subdivision, intended to use it as it had been used by writers of acknowledged authority on the subject of homicide for many years. But I think that that was not the intention. The intention, which I think is justly deducible from this statute, may be found elucidated by the provision contained in the same statute in relation to the second degree of murder. In addition to the change I have just called your attention to, the legislature transferred the crime of murder in the second degree, as it formerly stood, into the first degree. Murder in the second degree, under the former statute, as construed by the Court of Appeals, was a killing by a person engaged in the commission of a felony, without any design to effect death. The legisla-

ture, by the new act, have made that offense murder in the first degree, placing it as a third subdivision of the definitions of murder in the first degree. They have proceeded, then, to create a new second degree of murder—one altogether new when compared with the statute which they changed. The primary intention of the framers of this statute seems very manifestly to have been, by the creation of this second degree of murder, to intensify and make more plain their intention in the use of the words in the first subdivision of murder in the first degree. The words, as I have already stated, are, "from a deliberate and premeditated design." It was feared, I presume, that it might be open to hold that every *intentional* murder was justly within those words, if there were not some other expression in the statute which would preclude a court, in view of the common law, and of the existing authorities, from adopting that construction. In creating the new second degree, the legislature have therefore said, "such killing, unless it be murder in the first degree, or manslaughter, or excusable or justifiable homicide, as hereinafter provided, *shall be murder in the second degree when perpetrated intentionally, but without deliberation and premeditation.*" These provisions, in my judgment, have effected a substantial change in the law of murder. It becomes the duty of the court to instruct you, that to constitute murder in the first degree under the first subdivision of the present statute, something more than the actual presence of intention formed at the instant of the striking of the blow or firing the shot is necessary. There must be "a deliberate and premeditated design to effect death, distinguishable from a suddenly formed intention "without deliberation and premeditation." Otherwise, these provisions of the new act are without force or meaning, and the whole subject is remanded to the construction heretofore given to the repealed statutes, and the effort of the legislature to effect a change is made nugatory.

In a case, therefore, where the offense charged is murder in the first degree under the first subdivision, it is essential that it should appear that there was some actual deliberation and premeditation operating in and upon the mind of the accused in

respect to the subject-matter of the offense, before the actual occurrence of the fact which is alleged to be criminal. This may be illustrated by supposing a case of poisoning, where the party procures the poison, prepares it, and in some form most convenient, causes its administration or administers it. In such a case, the various steps prearranging the result, would, with great propriety, be found by a jury to indicate the deliberate and premeditated design required by this statute; so, where the offense is committed in another mode, as by shooting or stabbing, the previous preparations for the deed, the arming of one's self, the loading of the gun, the going to the place, the lying in wait, or the seeking of the interview, and the various steps, either prearranged in the person's mind, or taken with the view, in the judgment of the jury, to the accomplishment of the fatal end, might very properly be deemed to bring the case within the first provision of the statute, if satisfactorily shown.

Now, you will observe that, under this statute, the alleged deliberate and premeditated design is of necessity left open as a question of fact always for the consideration of the jury. The court has no power or right to decide, as a question of law in a case of this kind, whether the evidence presented does or does not establish facts which constitute deliberation or premeditation. The facts upon which that is claimed to exist are to be left altogether to the plain common sense of the twelve intelligent jurors. But you will readily see that, in the application of this rule to any given case, jurors are called upon to exercise their knowledge of human nature in its various diverse developments and characteristics; for, what would be deliberation and premeditation in one man might fall far short of being such in another. One man may require much more time to carry through a process to bring his mind to a determination to destroy the life of another, than some other man even under the same circumstances would require; for the human mind is not built according to the strict plan of any prescribed pattern. Men differ physically and mentally. Some men reason rapidly, and require little time to deliberate and to resolve. Others slowly, requiring more. Under this statute, it being only re-

quired that it shall be satisfactorily shown to the jury that the act was a deliberate and premeditated one, it is only necessary that the jury should see that, under the given circumstances of the particular case, the particular individual did, in his mind, go through the process of deliberation and premeditation reaching to the intention—the intention flowing from that process—which the statute requires; and, as I said a moment ago, one man may do this thing rapidly, requiring but a brief period to pass through the entire process, while another man's mind, under the same circumstances, and upon the same facts, would act slowly, and with greater caution. Nor can any strict rule be laid down by the courts as to the character or amount of evidence necessary to show the existence of a deliberate and premeditated design to effect death. Each case must depend upon its own facts and circumstances. One case may be proved by a long train of circumstances and events—another by a few sharp and startling facts; and in still another, the jury may find in the very act of killing in the manner in which it was done, the weapon used, the number of blows and wounds, the time and place where effected, the disposition of the victim, and the objects accomplished, everything requisite to satisfy them of the presence of deliberation and premeditation as components of the crime. It being, as I shall now presume, understood by you that before the prisoner at the bar can be convicted of murder in the first degree, you must be satisfied that his alleged offense was committed with the deliberation and premeditation required by statute as I have explained it, I shall now very briefly call your attention to the grounds upon which the prosecution claim that their proposition is established, so far as relates to the point of premeditation and deliberation, and to the allegations on the part of the defense upon which it is claimed, that the killing, if committed at all so as to be a violation of any statute, is not within the provision creating murder in the first degree.

In the first place, it is claimed on the part of the people, that the motive, which is the impulsive condition of things that sets the mind in motion toward the contemplation and consummation of a crime, existed in this case. It is claimed, substantially,

that that fact is shown by the fact that the father of the prisoner, who had been estranged from him, as well as from all his family, for a series of years, was a man whose bad and violent conduct toward the prisoner and his mother, and indeed the whole of his family, was so outrageous as to lead to the contemplation of such an act as has been committed. In a crime like that now charged, one of the first inquiries of the jury ordinarily is whether a motive exists, and if the party accused has suffered or been threatened with violence, has received or been threatened with injury, or believes himself to rest under any condition of things from which a jury can see that the thought of relieving himself by the commission of crime may enter his mind, the jury in such case are to look into those circumstances with a view to see whether or not they furnish evidence of the existence of motive. Substantially the people claim in this case that, because through a series of years outrageous letters had been written* and violent threats made, persistently running through a long course of time, by the deceased, and because of the separation of deceased from his wife and family, and his gross misconduct toward them, the prisoner might have formed the resolution that that state of things and the exposure to such assaults by letter or by worse means, should terminate, and, with a view to terminate it, had resolved that, if no other mode was practicable, the deceased should die. In all cases of this kind, where the accused party has received great injury at the hands of the deceased, when those facts are laid before a jury they are justly to be considered in a double aspect—first, as bearing upon this question of motive; for we all know enough of human nature to know that great crimes are seldom committed without some motive adequate to operate upon and control the mind of the party by whom they are committed. So, where a man, as was stated in the opening of one of the counsel, has been by a seducer deprived of his domestic rights by the debauching of his wife or his child, a jury, if he subsequently destroys the person's life, who, in his

---

* The letters of the deceased referred to throughout the charge were put in evidence by the defense.—[REP.

belief has been guilty of the offense, could have but little doubt as to the presence of motive. And so in this case the people claim that because this father had virtually abandoned the relationship and severed the ties that bound him to the prisoner, had heaped upon his wife and the prisoner great violence and abuse, had persistently followed them for a long period of time with these grossly outrageous letters which have been read before·you, that therefore you will be able to find a motive for the prisoner's alleged subsequent.conduct.

It is also insisted, on the part of the people, as tending to establish the alleged offense, that subsequent to the invitation to go to Europe with his uncle, which was communicated to the mother, I believe, early in the last week of May, and by her on Thursday of that week to the prisoner—subsequently to that, and on Saturday, the 31st of May, he received the last letter written to his mother by the deceased. It is claimed that that letter interposed an obstacle to the object which he then contemplated, to wit, a visit to Europe with his uncle; and that he, resolving in his mind that he would in some form remove that obstacle, took the steps that brought him into the presence of his father on that fatal morning when he was slain. It is claimed, substantially, that after receiving that letter on Saturday, on the Sabbath day he revolved in his mind whether he could not by some means place himself in a position in which he could enjoy the invitation which he had accepted through his mother, to visit Europe with his uncle, and relieve his mother and himself from all fears of the monstrous approach of his father. It does appear in the case as a fact that he wrote on Sunday to his uncle, announcing the receipt of the letter from his father—announcing, first, that his mother had told him of the invitation his uncle had extended to him to accompany him to Europe. He then says:

"I have only recently entertained any desire to go to Europe, and the invitation was particularly acceptable; and as I would have to leave her soon anyway, probably, to attend the Albany Law School, I told her, on her intimation that you wished an answer in the morning, that she might say I would like to go."

This shows that the invitation was agreeable to him, and had

been accepted by him, before he received the letter from his father.  He then proceeds to say :

"I am of the opinion that it would be neither safe nor wise to leave her unprotected against father's acts.  In fact, I don't think her situation is by any means a safe one as it is.  I inclose a letter from father to her, which I received yesterday. I am going down to New York in the morning to try and see him, and, I will add, without informing mother, as she would feel very uneasy."

So far you would be justified in finding from this letter that the invitation had not only been accepted as an agreeable one, but that on the receipt of the letter from the father on Saturday an obstacle had interposed itself, after the acceptance of the invitation, in his mind, to the enjoyment of the opportunity it gave him to go abroad.  You would be justified, perhaps, in inferring that he had been thinking over in what manner he could get over that obstacle—in what mode it might be gotten over—and had resolved, as he stated, to go to New York in the morning, which would be the Monday following, for the purpose of taking steps to relieve himself and his mother from the fear that he entertained as to her safety in his absence.  All that is justly inferrable, I think, from this letter, although not so fully expressed in words.  The people claim that in pursuance of that determination, wholly or completely formed on the morning of Sunday, that he went to Mr. Smith, a merchant, with his young friend Pond, and made an application to borrow some money.  Mr. Smith says that he came to him about eleven o'clock on Sunday, and saying that he was going out of town for a day or two, or that he thought of going out of town for a day or two, and was "short"—to use the language of Mr. Smith—and asked him for the loan of fifteen dollars until he should return on the following Tuesday.  Mr. Smith says he replied that he had no money by him, but that if he would call at his store on Monday morning, he would let him have it. That, you will observe, was in the morning, before he and Pond and his cousin had made the visit to the cemetery, that has been described by them.  At what hour this letter was written does not appear; but it would appear from the letter, that the

resolution, not completely formed when he talked with Smith, had, at the time the letter was written, ripened into a conclusion to go, for he says in the letter: "I am going down to New York in the morning to try and see him, and, I may add, without informing mother." The people claim that, in pursuance of that resolution, thus formed and expressed in this letter, he arose early on Monday morning, at the time when his mother describes him as appearing in the hall, very pallid, and looking sick, and that he went, pursuant to the arrangement made with Mr. Smith on the day previous, to his store, and there borrowed the fifteen dollars, and thence went to the cars, and thence to the city of New York. The facts that I have thus far detailed do not seem to be in dispute. What just inferences are to be drawn from them, or any of them, is a question altogether for you to determine.

The district attorney also claims that, before leaving home, the prisoner prepared himself, by loading or by taking with him the pistol with which the fatal shots were fired, putting that into his pocket for the purpose of coming to New York to see his father. That he arrived here in the city, and went directly from the cars to the boarding place of his father, does not seem to be contradicted by any evidence in the case. You would not be justified in finding that he went first to the hotel, because the evidence quite clearly shows that he went first to the boarding-house of his father, and called for him, but did not find him in. He then stated to the lady of the house that he wished to see his father at the Sturtevant house, and that he was his son (after her inquiry whether he was or not), and should be at the Sturtevant house. At her suggestion he sat down and wrote the note of invitation to his father to come to the Sturtevant house—"within an hour or two," I think, is the language—stating that he should be there, and wished to see him "to settle some family difficulties." I think that is the language.

It is claimed, on the part of the people, that these steps—the preparation to come, and the various steps preceding the coming—were deliberative acts on his part with a view to consummate a particular purpose. The prosecution claim that that

purpose was either the destruction of his father's life by shooting him, or the alternative purpose of effecting what he calls a settlement, by securing a satisfactory promise that he would not annoy his mother any more, and, on the failure to obtain that promise, to destroy him.  It is claimed that that intention is further illustrated or shown by what occurred subsequently to the shooting.  The prisoner, as it would seem, immediately after the shooting—for I do not now make any allusion to what occurred in the room itself—went down with haste to the office of the hotel, and announced to the clerk that he had killed his father; and when the clerk expressed his astonishment by asking him if he meant that, replied, "Yes, I have shot him four times; send for a police officer."  And presently, after a police officer had been sent for, he dictated a telegram to his uncle, saying, "I have shot father.  Look after mother."  These things, it is claimed, were done with a coolness and deliberation evincing a full knowledge of what he had done, and of its consequences to his father, and of the consequences to himself, because the sending, by his own direction, for a police officer, indicates, as is claimed, that he knew the act was of a character that would transfer him to the custody of the law.  Then, in a short time, he was taken, as it seems, in the company of an officer who had been summoned, from the district telegraph office to the police station, and there, it is alleged, that when inquired of by the officer, he stated substantially that he had shot his father three times.  Perhaps I ought to read this, inasmuch as I may make a mistake in my recollection if I attempt to give it otherwise.  When asked by Sergeant Keating, after coming to the station-house, he stated that he had shot his father and wished to give himself up.  Just as the officer was about leaving, he says: "He took that pistol [the pistol being identified] out of his left hand pocket and handed it to him and said 'this is the pistol I shot him with, you had better take care of it.'"  The pistol, as the officer describes it, was then unloaded as to four barrels and loaded as to one.  The officer said: "I asked him after he handed me the pistol, if his father was dead.  He said he had killed his father.  He said he must be, for the last time he shot him he was very close

to him.  I then asked him why he had done it, and he said he and his father and mother had not lived together for some time, and that he (meaning his father) had threatened to shoot both him and his mother some time previous.  I then asked him how long it was since he had seen his father last, previously to that morning, and he said, not since last fall.  I then asked him if he had any disturbance previously, and he said none.  Then I asked him if he had no disturbance that morning previous to his shooting him, and he said, none.  When his knife was taken from him, he said, why do you take this from me?  Do you think I will commit suicide?  If you think so, you are mistaken.  He showed me the back of his hand, the skin of which was erased or scratched, which he said was burned by the powder.".

Now, these several declarations made by the accused, as is alleged on the part of the people, coupled with the several steps that had been taken at Saratoga preparatory to coming down here, are, as it is claimed, facts, if you find them to be as stated by the witnesses, which by reflective influence shed light upon the design and purpose for which the prisoner came to New York, either, as is claimed, with the intention of shooting the deceased any way, or of shooting him in the alternative result of his refusal to make a satisfactory promise.

Sergeant Washington Mullin, who saw him soon afterwards, while the coroner was present, testified that he was asked by the coroner: ".Where do you live?  In Saratoga.  What do you do; what business do you follow?  I have been studying law."  The coroner then said, "Well, if you have been studying law, then you know about what course to pursue in this matter, you know what steps to take.  He said he arrived in town yesterday afternoon at a quarter before three.  Did you come to see your father?  I came here expressly to do this. , What! to kill your father?  Well, to settle this family difficulty.  I understood him to say he fired three shots."

Now, these are declarations of the prisoner made, as is alleged by the witnesses, on the same day and within a few hours after the alleged offense was committed, and it is claimed that, coupling them with what had preceded, and looking back at the

great cause of hard feeling on the part of this youth towards his fath..r, seeking a motive in the gross injustice and wrong done the mother, and done the entire family, and in the danger which the boy imagined existed from the father, if his mother was left unprotected by him, and, following the various steps of the alleged preparations, it is claimed that these things show that the consequence which unhappily followed his coming to New York was revolved in his mind, considered and determined upon, either to be done at all events or to be done in case no satisfactory arrangement could be made.

Then the counsel for the prosecution presses upon you—and it is for you to determine with what force it comes—the concluding clause of the letter to his uncle. It is insisted that it indicates an anticipation on his part of some result that would place it out of his power to go to Europe or anywhere else. I will read to you the words of the concluding part of this letter, reading in connection therewith the preceding clause: "I enclose a letter from father to her which I received yesterday, I am going down to New York in the morning to try to see him, and, I may add, without informing mother, as she would feel very uneasy. My trip will determine any question in regard to my going to Europe or anywhere else. I will be heartily sorry if I shall have caused you any trouble or expense."

Now it is argued before you, and it is for you to determine with what force that argument comes, that this concluding clause was intended by the accused to give notice to his uncle that the contemplated visit to Europe would be dependent upon the result of his visit to New York, and the accomplishment of what he had in his mind in that city, and that that accomplishment would control the question whether he would go to Europe or anywhere else, and that he says to his uncle in anticipation of some cause of trouble or expense to his uncle growing out of this trip, he shall be heartily sorry if such consequences follow. The argument is, and it is for you to determine what force there is in it, that he had in his mind the contingency that in case he did not succeed in an arrangement satisfactory for the relief of himself and his mother from further

danger, then trouble and expense to the uncle might follow from what he designed to do, and his inability to go to Europe or anywhere else might also follow. Gentlemen, this is substantially, as it occurs to me, what is claimed, and I repeat it is altogether for you to determine whether the proof justifies or not the claim on the part of the prosecution. I say it is substantially what is claimed by the people as bearing on the proposition that the accused came to New York with the resolution in his mind, either that the father should die in consequence of the wrongs he had done his mother and himself, or that if the father refused or failed to make an arrangement satisfactory to him to relieve him from further fears as to his mother, or in respect to his mother and himself, then he would destroy his life. All that the court can say on that subject further is, that if you come to the conclusion, on looking at this evidence, that the prisoner did come to New York with either of these resolves in his mind—a resolve when he reached here to shoot his father, or a resolve when he reached here to first attempt an arrangement, and, on his failure, to shoot him—in either event, if you are satisfied that he did shoot him in pursuance of either resolve, the crime will be murder in the first degree, and it will be your duty, unless the defenses alleged here are one or both satisfactorily established, to find the prisoner guilty of that degree of murder.

Now it becomes my duty to go over the evidence which is claimed on the part of the defense, to show the absence of that premeditation and deliberation which the statute requires under the construction I have given it. First, it is claimed to be shown by Mr. Smith, in addition to what I have stated before, that at the time of borrowing the money he expressed to him an intention to return to Saratoga on the Tuesday following.

The argument is also presented that the sum borrowed would be just about adequate to bring him to New York and back again, covering his expenses in an absence of a day and night. That on Monday morning he met Mr. Amsden, doubtless while he was on his way to the cars. And Mr. Amsden, I believe, or the prisoner, first spoke, asking him when they should have another social game of whist, it appearing from Mr. Amsden's

statement that the prisoner and some other parties were accustomed to go to his shop to play whist. Mr. Amsden suggested that they have a game that afternoon, to which the prisoner replied, "Wont it do just as well to-morrow?" indicating, or saying, that he expected to be absent until to-morrow; and Mr. Amsden replied, "Very well," or to the effect that the afternoon following would do just as well; that before leaving he left a verbal message for his mother, saying that if he did not get back to supper she need not expect him until the next day. Then it is claimed that when he arrived here he went, as is conceded, first to the place of his father's residence, and that his not finding his father led him to go to a hotel; that his real purpose was to go to the residence of his father, and there consummate the contemplated arrangement, and return to Saratoga the same night, which would bring him home, as the other statement made by him would indicate his intention to be, on Tuesday morning; and it is argued, also, that his familiarity, or probable familiarity, with the consequences of the crime, to wit, arrest and detention, are to be considered by you as indicating that his intention was not to do an act when he came to New York that would cause such arrest and detention. Those are substantially the circumstances and facts which are claimed here to indicate a design to return and to overthrow the idea that his purpose was to kill his father when he came down to New York.

Now, gentlemen, if he left Saratoga with the full expectation of returning, that he formed that resolution and so advised his friends, and you are convinced that his intention was to come here and return, and you can see through that that he had not any resolve in his mind to kill his father when he left, or that he did not entertain the alternative resolve to get an arrangement satisfactory or else kill him, why, as a matter of course, the theory of premeditation and deliberation, will be shaken or overthrown as you may give force to those suggestions on the part of the defense. Nevertheless, it is a just subject of consideration for you, in respect to all this kind of evidence, that where such a resolution has been formed, as is claimed by the people, in the mind of a party, whether it would not be an

unnatural thing, as a general rule, to give any expression in advance, indicating its existence, and whether declarations made in respect to returning, when one left for such a purpose, are to be taken with less force than as though no such purpose had been entertained, or as though no such consequences were in possible contemplation. So, also, it may be considered with propriety, whether, if he had the alternative proposition in his mind, his speaking of his return, his intention to return, or his being probably back on Tuesday, is not referable to this alternative idea which he may have expected to consummate by procuring an arrangement under which he would have returned, and that while he felt that he might procure the satisfactory arrangement, he still entertained what the people claim, to wit, the resolve that if he failed in making the arrangement, he would then do the act for which he now stands charged. All these are considerations solely for you, and my sole object in alluding to them at all is to bring them fairly before your minds. I repeat, gentlemen, unless you are satisfied by the evidence beyond reasonable doubt that the accused, at the time of committing the act, had that deliberate and premeditated design to effect death in his mind, and was executing such a deliberate, premeditated design in firing the fatal shots, then the crime would not fall within the first degree. This, of course, is the gravest subject for consideration in the case. The people are required by law to show to your satisfaction, beyond what the law calls a reasonable doubt—that is, beyond doubts reasonable and satisfactory to you, which arise from the evidence and its character, or from the absence of satisfactory evidence in the case—that such was the intention of the accused, and that he acted upon such deliberate and premeditated intent. It would make no difference, in my judgment, if that deliberate and premeditated intent was an alternative one, and that he carried in his mind, also, the hope and prospect of consummating an arrangement in accordance with the first of the alternatives; if he, at the same time, entertained the resolve that he would kill the father if he could not consummate the first alternative, then the act of killing in pursuance of such deliberate resolve would be murder in the first degree. But you are

to be satisfied beyond a reasonable doubt that one or the other of those resolves was in his mind, and had been deliberately determined upon in respect of its execution at the time he fired the fatal shots, in order to bring him within the present law.

That brings me down to the consideration of the question of murder in the second degree. You will, of course, observe with care the peculiar language of that definition. "Every intentional killing without deliberation and premeditation" is called murder in the second degree. If you determine this case upon the first degree against the accused, you will not, of course, be called upon to consider whether or not the case was within the second; but if you determine it favorably to the accused upon the first issue—the issue as to murder in the first degree—then it is your duty to consider whether the circumstances of the case bring it within murder in the second degree. In order to constitute murder in the second degree, it is necessary under this statute that there should be at the time of firing the fatal shot, in this case, an intent to kill. Shots fired by accident—shots fired with a design not to kill, but to injure and wound—shots fired for the purpose of frightening a party—are not, within this statute, which requires the actual presence of existing intention; but this statute does not require that that intention should be the result of predeliberation; it may be formed upon the instant; it may be the result of that instantaneous action of the mind which oftentimes accompanies the commission of crime, when from some cause arising upon the moment the thought flashes into the mind, "I will kill," and the act follows the thought. That was murder in the first degree; now it is murder in the second degree; but the jury must be able to find from the facts and circumstances of a given case that that thought became an intent, consummated by an act resulting in death, in order to constitute the crime, now, in the second degree. So that, if you should conclude that the prisoner did not, when he left home, contemplate the killing of his father, that he did not entertain the alternative resolution of which I have already spoken, but that he came down here armed, prepared for any event that might arise, called upon his father, and finding him out left his invitation

to come to the Sturtevant house, and when he came, and after he was within the room, from their conversation feeling that the father's promise, as he himself says, was an evasive or false one, not intended to be carried out, and feeling that in his look, or in his appearance, there was something to show that the same intention to pursue and wrong his mother and his family that had previously existed was still there, and would still be consummated, he had, upon the instant and without reflection, resolved, "I will terminate this by his death"—that would make the act murder in the second degree, and not in the first, and the offense drops down in that view, if the jury should be satisfied that that is the correct conclusion, from murder in the first degree to murder in the second degree, unless some one of the defenses alleged shall, upon the evidence in the case, be found by you to exist. I do not think that any further instruction on the subject of either of these degrees is necessary, or will be useful. I have sought to explain the law to you as clearly as in my power, so that you will see what is necessary to constitute the offense, and to what you are to apply the facts as you may find them under either of these two degrees.

And now, gentlemen, I wish, right here, to say a few words in relation to the character of this case, as it appears upon the evidence which has been introduced and laid before you on the part of the defense—I mean its general character. What I shall say as to the particular points of the defense, hereafter, will have no particular bearing upon what I now design to say about the conditions, relations, and mutual obligations of these several parties, and about the law that is applicable to them. In the first place, I wish to say, what you and I feel beyond all doubt, that it is manifest in this case that the deceased, through a period of years—however he may have stood to the outward world—had exhibited toward his wife and toward his children a character despicable beyond description, and one upon which too severe comment cannot well be made. I speak now of what appears in this case before you, and judging from that alone. Unfortunately for us, who are limited in our knowledge of this as of all other cases by the finite character of our capacities to appreciate or discover truth—unfortu-

nately for us, I say, we are deprived by the death of this father of any explanations that he might have given before the jury, if this assault had not resulted in death. His mouth is sealed forever. The opportunities on his part of saying what he possibly might say, so far as anything could be said in justification of his letters, is gone; is gone, too, by the hand of the prisoner. His hand inflicted the blow that deprives us of all opportunity of hearing the other side of the story, if there be any other side, which I do not say, but which possibly the deceased father might have given us. And now this leads me to say, in respect to these letters and the evidence that has been given here touching the character of the deceased, that jurors, in this class of cases, ought to be careful to remember what they are sometimes too prone to forget, and what the general public are too apt to forget, that, in the eye of the law, all men, without respect to condition, character, habits or deserts, or their moral or their physical natures, are under the protection of the law. The same shield that the law interposes over each of you, with which it sits continually by your bedside at night and in all your domestic relations, and follows you in all the pursuits of life, is held by the genius of the law at all times over all other persons, however humble they may be. That wild and false notion of justice, that a man who may have been guilty of private wrongs and has met a violent death, shall have his grave raked open to show his character and his pursuits in life, for the mere purpose of creating a public sentiment that he was so bad a man that he ought to die—I say that wild notion of justice has no foothold in the administration of law; and I make these remarks because I know how apt it is for men to come to conclusions in respect to the character of a deceased man when violently attacked after his death, and after his opportunity for explanation is forever closed; how apt men's minds are to be warped from the true nature of the case by the hatred, so to speak, engendered in the human mind by pictures of monstrous depravity and wrong. All that is justly and properly to be discarded from the consideration of such a case as this. It may be that Walworth was a man unfit to live, but the Judge who is to determine that does not sit in this seat nor

in this jury-box.   He presides over all the affairs of earth, and He determines those questions by what neither you nor I possess —the infinite knowledge and the omniscient eye that reads every soul, and finds truth wherever it lies.   The law on that subject has been so well expressed that I wish to read it to you in a very few words, as stated by Chief Justice DAVIES in a case in this State :

"The general bad character of a person slain can neither tend to show that the party is not guilty of homicide, or in any sense to mitigate the taking of human life.   Equality before the law is a maxim of universal justice, and the life of the humblest and most abandoned is equally entitled to the protection of the law, as that of the most cultivated, refined or elevated.   It is not for man to say which may be taken and which spared."

And one of the most eminent writers on the subject of criminal law quoted in this case, says :

"In the eye of the law, to murder the vilest and the most abject of the human race is as great a crime as to murder its greatest benefactor."

In a government of laws, as ours is, to be administered for the protection of all, no other rule is safe, no other rule is just. Any other rule perverts all law, because it makes the person who has received injury, or supposed injury, from the deceased, judge, jury and executioner in his own cause, and clothes him with the power to inflict death, because he thinks his enemy ought not to live.

No, gentlemen, I beg you to bear in mind that you are sitting in a country where justice is administered by law; and that all considerations as to the character of the deceased, so far as they tend to create in your minds any idea that that character was one which might justly be removed from earth, and that, therefore, the person who has removed him by violence, should be excused, are not worthy of place in a court of justice.   I beg you to bear in mind that when you give place to such considerations for such a purpose, you overthrow all law; you strike at its foundation ; you pervert justice, and you refuse to protect the humble and the bad by the same law which you would apply to protect the powerful and the good.

Now, gentlemen of the jury, the defenses alleged in this case are substantially two-fold; first, that the prisoner, at the time of the alleged crime, was what the law calls insane; secondly, that he acted, in shooting his father, in self defense. I think all the alleged defenses, except the one upon which I have just commented, which in law is no defense, are justly attributable to those two classes. I must go through them briefly. First, I will consider the one secondly stated, the question of self-defense. The right of self-defense, which is by nature engrafted in every human heart, is recognized fully by the law under circumstances which the law clearly and emphatically points out, and where self-defense, coming within the circumstances thus pointed out, requires the taking of human life in order to make it complete, the law justifies the act, and declares it to be justifiable homicide. The act of the prisoner is claimed to have been justifiable homicide under the statute of this State, which I shall now read to you: Our statute divides homicide into various classes; first, excusable homicide; second, justifiable homicide; third, manslaughter in its four degrees; and, lastly, murder in its two degrees; and it is intended by the statute to create a clear and distinct system to govern all cases of homicide. The statute does not recognize "parricide" as a distinct crime. It groups homicide under one general phrase, "every killing of a human being." The fact that the prisoner killed his father does not raise his offense in legal contemplation any higher than though he had killed a stranger whom he had never before seen. The relationship is one which would be, of course, very likely and very properly apt to excite horror in the public mind, and to call down anathemas from the press and otherwise upon the accused; but when we get down to the trial of a case, here in a court of justice, we are to look upon it as a homicide, and not convict a man because he killed his father, upon any other evidence than would convict him had he killed a stranger. That is the simple law of the land, and the prisoner is entitled to the same protection of the law in acting in self-defense against and upon his father as he would be in acting against and upon any other individual. All these notions about an old law of

Rome, of China, or Greece, or anywhere else, in which the relationship of parent and child was of such a character that horrible punishments were inflicted where a son killed his father, when brought to bear upon such a case as this, are simply fanciful and ineffective, so far as the law is concerned; for the law looks upon the act—however we may look upon it as individuals—the law looks upon it and treats it just as though it were an act between strangers in which the same results followed. Therefore it is that, in considering the defenses of the prisoner, you are not, because one is struck with horror on first hearing that a son has killed his father, to condemn the son without sufficient evidence, nor are you to give less weight to his exculpatory evidence, where he produces it, than you would if he had produced the same evidence having killed a stranger. It may have been wise for the ancients to have their laws; but we are not administering their laws, we are administering ours. Therefore, in considering this question, the prisoner is entitled to the benefit of the law that his right to self-defense, if the exigency arose calling for the exercise of that right, was precisely the same as though the deceased were not his father.

I now call your attention to the statute declaring what is justifiable homicide.* "Such homicide is also justifiable," the statute says, "when committed by any person in either of the following cases: First, when resisting an attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling-house in which such person shall be." Under that subdivision there must be an actual attempt either to commit murder upon the party or to commit any felony, such as rape upon a woman, in which she is perfectly at liberty under this statute to kill the assailant to escape the attempt that he is engaged in making. "When committed in the lawful defense of such person, or of his, or her husband, wife, parent, child, master, mistress or servant, when there shall be a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design being accomplished."

---

* 3 R. S. (7th ed.), 2473, § 3, subds 1, 2. See *Pen. Code*, § 205.

You will mark the language of the statute. Homicide is justifiable when committed in lawful defense of such person, when there shall be a reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished. You will see, gentlemen, that this section relates to a transaction occurring in respect of parties present at the time and place of its occurrence; so that, under this statute, if the deceased had come to Saratoga at any time and entered the residence of Mrs. Walworth, and drawn his pistol apparently to shoot her, the son would have been justified in shooting him down upon the spot, provided the jury should see from the circumstances that there was reasonable ground to apprehend a design to commit a felony, or to do her a great personal injury and apparently imminent danger of such design being accomplished. But, as a matter of course, this statute has no application to a case where there is an allegation of danger to an absent person. By that I mean to say that no amount of threats against Mrs. Walworth that may have been made and come to the knowledge of this young man, no fears on his part that Mrs. Walworth would be injured by her husband on some future day, in consequence of threats made, would in the slightest degree justify him, while she was at home in Saratoga, in shooting down his father here in New York. That would be something which the law cannot and does not justify; and if the prisoner, animated by threats toward his mother, shot him down for them, and because he thought those threats might at some future day be executed, he has no justification under this statute. While being in that room with his father alone, the danger, or apprehension rather, of the design to commit felony, or to do some great personal injury, and the imminent danger of such design being accomplished, are, by the law, limited altogether to his own person, and in the consideration of this question you have no right to give him the benefit of his fears as respects injury to his mother in the future, except, as I shall presently present that question to your consideration, that those fears may have tended to give point in respect to the then present imminent danger to himself. All that I shall consider

in a little while in another aspect of this defense. Before, therefore, you could find in this case a justifiable homicide, it would be necessary that you should be able to determine that there was reasonable ground to apprehend on his part a design to commit a felony, or to do some great personal injury, and reasonable grounds to believe that there was imminent danger that such design would then and there be accomplished. Where that state of things exists, the party may defend himself by destroying life, if the jury are satisfied—for it all ultimately comes to the jury—that the imminent danger was of such a character that he was justified in believing that, if he did not destroy the life of his antagonist, his own would be destroyed. In a leading case in this State, which is the case of Shorter v. People in the Court of Appeals (2 R. S. 193), the rule is stated by · Justice BRONSON, in words which I will read to you, substituting them, as I intend to, for any expression on the subject of my own. He says: "When one who is without fault himself is attacked by another in such a manner and under such circumstances as to furnish reasonable ground for apprehending a design to take away his life, or to do some great bodily harm, and there is reasonable ground for believing the danger imminent, that such design will be accomplished, I think he may safely act upon appearances and kill the assailant, and the killing will be justifiable, although it may turn out afterwards that the appearance was false and that there was, in fact, neither design to do him serious injury, nor danger that it would be done. He must decide at his peril upon the force of circumstances in which he is placed, for that is a matter which will be subject to judicial review."

By a judicial review, he means simply the determination of a jury, in a court of justice. Now, I think, you will understand what, under our law, is justifiable homicide—the reasonable ground to apprehend at the time of the killing a design on the part of the person killed to commit a felony or to do some great personal injury, and the belief that the danger is imminent that such design will be accomplished. It is for the jury to determine upon all the facts presented to them whether those elements existed at the time, and if they did not exist, then it

is for them to decide that the occasion did not justify the killing. If they did exist to their satisfaction, then the party is by the statute entitled to the verdict of acquittal, the Legislature having taken pains to go so far as to enact expressly that where the defense is established to the satisfaction of the jury of justifiable homicide, the jury shall render a general verdict of "not guilty." Now, in this case, what is brought before you for the purpose of satisfying you that the deceased was killed under circumstances rendering it justifiable homicide? It may, perhaps, be unfortunate, but we really have no evidence on that subject as to the real transaction at the time of its occurrence, except what we find in the statement of the accused made before the coroner, and made at several other times after the event.* Perhaps I shall do better justice if I read the statement fully, for I may possibly have misapprehended myself some portions of it.

He says, "I am guilty of no crime; I will make a statement. My father treated my mother very cruelly for years, incensed against his own father for putting his little share of the property in trust, so that my mother and the family got something out of it; my father kept writing letters to my mother full of imprecations against his father. He wrote to her, among other things, 'I will kill your boys and defeat the damned scoundrel in his grave, and cut off his damned name forever.' He also threatened my mother's life; about three years ago he beat my mother cruelly; I was not present but saw the marks. When I heard this I loaded a pistol belonging to a cousin of mine and have carried it. I supposed my father was armed, at least when he came so see us. My uncle, Clarence Walworth, has been as a father to us. He recently proposed to take me to Europe with him. I was troubled about leaving my mother without a protector. On Sunday last, I wrote this to my uncle, and that

---

*The killing took place at an interview between the deceased and the prisoner, in the room of the latter at the Sturtevant house, a hotel in New York city. No one else was present, and the prisoner was not put upon the witness stand.

The statement above referred to was put in evidence by the prosecution. —[REP.

I must go and see my father, and whether I could go to Europe or not would depend on that interview, from the fact that I wanted to get reliable assurances that he would not molest my mother during my absence. I had no intention of killing him. When he came into my room I asked him to sit down. He did so; I spoke to him of his conduct, and said: 'promise me that you will neither shoot my mother, nor insult her, nor any of the family any further.' He answered me, 'I promise;' but with a look which, to my mind, implied contempt and the reverse of an intent to keep the promise. He had just before put his hand up to his breast as if to pull out a pistol. I am unconscious of having fired more than three times. He closed on me rapidly; his grasp was upon me when I fired the last time. I don't think he said anything the whole interview but what I have stated.                F. H. WALWORTH."

That statement, gentlemen of the jury, furnishes every matter of fact touching this interview bearing upon the question of the actual presence at the time, of imminent danger to the life of the prisoner, and of the intent, or attempt, or reasonable ground to apprehend a design to commit a felony or do some great personal injury to him. Of course, it is a question not of law, but of fact purely, for you to determine, whether it furnishes satisfactory evidence that there was reasonable ground to apprehend a design to commit a felony or to do some great personal injury. The declarations of an accused under such circumstances, are justly to be presumed to have been made as favorable to himself as truth would permit. That is all I feel bound or required to say in respect to the fact that this statement comes out of the mouth of the accused. I repeat, that the statements of the accused, when giving a narrative of his own alleged offense, are justly to be presumed by a jury to be as favorable to himself as the truth would permit him to make, and you are to determine, therefore, whether upon the statement itself there are circumstances which gave him occasion to believe that there was reasonable ground to apprehend a design to commit a felony or do some great personal injury, and imminent danger of such design being accomplished.

In the first place, in considering this branch of the defense, it is my duty to say to you that you should take into consideration that the deceased was invited by the prisoner to the interview that he had in his room that morning. I do not mean by this, that he was invited by the note he left at the deceased's boarding place to the particular interview in the morning by any means. That invitation was of another character. He left a note saying to him that he would see him at the Sturtevant house after an hour or two, which, whether it expresses it or not, fairly implies that he would see him in the course of that afternoon; that is its fair implication and meaning, in my judgment. That note, of course, did not invite him to that particular interview on the morning of the 3d, but it gave him notice he was at the Sturtevant house, and desired to see him for the purpose of settling family matters. Now, the district attorney urges upon you the fact that the deceased was out till a late hour in the evening with one of the witnesses that night; that he probably did not get that note, not having returned to his room until a late hour, and probably found it at a late hour of the night, and went early in the morning to anticipate a possible departure of his son by the early train, to see him at the hotel. Whether that is reasonable or not, it is entirely for you to judge. I express no opinion to you about it, as I do not mean to express any opinion to you about the facts, as facts. He went about six o'clock in the morning, and now occurred what I say was an invitation, or would justify you in finding that the prisoner invited the deceased to the interview. It may be briefly stated. The deceased went up to the bar of the hotel and made an inquiry of the clerk—of some clerk—who turned to young Barrett and asked him what young Walworth's room was, and Barrett replied that it was No. 267. Mr. Walworth, the elder, wrote on a card his name. It was laid on a salver in the ordinary way, and taken by the bell-boy up to the prisoner's room. The prisoner was evidently asleep. The first knock, whether it aroused him or not, did not get any speedy answer, and, after waiting a little while, as the bell-boy described and illustrated by knocking here; he knocked again, and simultaneously with that knock the door opened. He saw the pris-

oner's face, and saw the hand extended past the door to receive the card. He had said to him, just at the time of 'the second knock, "Here is a card for you, sir," handing in the card. The prisoner took it, and said : "I am not up yet," or "I am not dressed," and thereupon the bell-boy went down and communicated to the father that the gentleman would be down presently. The father waited. As the bell-boy states it, in from five to ten or fifteen minutes afterwards the bell of 267 rung, or rather the indicator of 267 dropped down, showing that the bell had rung; he then went up again to the room, and there found the prisoner. He knocked at the door and the prisoner said "come in." The prisoner was sitting, as he describes it, by the window in a chair, dressed, and with his overcoat and his hat on. He told the bell-boy, "show the gentleman up;" and thereupon the bell-boy returned and escorted the deceased to the room. That is what I mean by the interview being in the room upon the invitation of the prisoner, and not, as a matter of course, except by indirection, upon the note which had been left at the house the day before. The prisoner says, that the deceased came into the room and he asked him to sit down, whereupon he did sit down. What was said does not appear, except as we are able to gather it from the proposed object of the interview as stated by the prisoner, and from what was heard by those persons who occupied the adjacent rooms. The prisoner says, "I spoke to him of his conduct." In what manner, or what he said, is not disclosed. Perhaps the language was brief. It cannot be supposed that it was necessary, in order to advise this man of what his conduct had been, to go into any detailed statement of fact; for if he was a man of ordinary intelligence, he must have known what that conduct had been. In some portion of this conversation, the occupant of 266, I think it was, heard, which he now recollects, three words, "Home," "Mother," "Liar." It is claimed by the district attorney that those words came from the mouth of the prisoner, and he bases that claim upon the prisoner's statement that he does not think his father said anything except the words, "I promise." Now, in what form the prisoner presented the subject is for you to fill up as best you may from what you may consider the proba-

bilities of the case as they were there. You have the right, if you think proper, to take this skeleton given to you by Mr. Ebert—it is the merest skeleton in the world, three single words—and fill them up as you justly think the actual occurence requires, and you have the right to determine from whose mouth they probably proceeded, and to weigh the force of the statement of the accused, that his father, as he recollects, said nothing except "I promise." We are left in doubt about that. What the evidence tends further to show—it is for you to determine whether it satisfies you in the case—is that speedily after those words were heard a shot was fired. Mr. Ebert says that he first heard the words, and very soon a shot. The occupant of the adjoining room, 268, says that he was lying on his bed and heard the boy come up with the card and say, "Here is a card for you." And afterwards heard the door either open or close, which he does not know, and soon heard the shots as rapidly as a pistol would ordinarily be fired, and two cries of murder. The prisoner says, however, that his father was accustomed, or his father, he supposed, would be armed, especially when he met any of them, having reference undoubtedly to the threats of the use of arms against them, from which he inferred that he would probably come into their presence armed. He says that just before these words, "I promise," were used, he saw a motion of his father towards his breast, indicating to his mind that he was about to draw a pistol, whether he was then sitting on a chair, or had arisen, it does not appear; whether his own pistol was drawn or not is not stated. Those things are left for the jury to infer. But the statement indicating the presence of a thought in the mind of the accused that he was in danger, is that in respect to the motion. He says, "he had just before put his hand up to his breast as if to pull out a pistol." No pistol seems to have been pulled out.

The evidence tends to show that no pistol was there, and the body, when found a little while after, while lying on the floor, had, in addition to its clothing upon it, nothing except the blood-stained note that is shown to you, and a small bunch of

keys in the pocket; therefore, if that testimony be true, there was clearly no real danger, no real attempt to draw a pistol, and it is for you to say whether the deceased, at that time, did anything that justly and fairly gave the prisoner a right to believe, under the circumstances, that he was about drawing a pistol to shoot him; that he had reason, I mean, to fear, or to use the exact language of the statute, reasonable ground to apprehend a design to do him some great personal injury, and reasonable ground to believe that there was imminent danger of such design being accomplished. It has been held in some cases that this rule does not apply in its fullest force to a case where the meeting is produced by the invitation of the party who fires the pistol or inflicts the blow; as for instance, where A, knowing that B has threatened his life on various occasions, and knowing that he entertains inimical feelings toward him, sends a message in effect inviting B to a private meeting, and in that private meeting kills B, it has been said that the rule of the statute is not applicable to the case, because the meeting is brought about by the invitation of the party killing, and that he, in such a case, having invited the meeting, has no right to insist that he had reasonable fears of the party whom he had brought into his own presence. But I think, gentlemen, that that is not the true rule of law in such cases. I think this, that where the meeting is brought about by the party who slays, a jury have the right to require, especially if the person thus brought into the presence of the slayer is an enemy whom he has reason to fear and whom he kills—a jury have a just right to require at his hands strong and satisfactory evidence that he was placed in the position in which the statute justifies the killing, and that is as far as, in my judgment, the rule ought to go. And it is, in my judgment, also a just limit to attach to the rule. Where, I repeat, the invitation comes from the person who kills, and the person killed is brought into his presence, and there slain while alone, there being enmity between them, or there having been threats on the part of the person killed as respects the person who kills, such a state of facts should require at the hands of a jury a careful investigation to see whether or not it is true that the

person who slays under such circumstances was really in the position required by the statute in order to justify the offense. But if a jury, in such a case, can see that the real condition existed, notwithstanding the invitation by the slayer, he would be entitled to the protection of the statute to the same extent as though the meeting was accidental, the only difference being in the operation of the minds of the jury in applying to the case the evidence which is given before them.

Now, on this question, I repeat you are to determine whether the prisoner has satisfied you by evidence that the exigency arose where self-protection or the right of self-defense, as given by the statute, was actually exercised by him. If so, he is entitled to the benefit of that as a defense. In considering that subject you have the right, of course, to look at antecedent threats that are alleged to have been made, for the purpose of determining whether the mind of the prisoner in reaching these conclusions was operated upon by those threats, and the threats were of such a character as may justly be said to have justified his mind in reaching more readily the conclusion which justified the killing under the statute. Upon that principle threats are always admitted, because when a person comes into the presence of another having threatened his life, and does acts indicating an intention to take that life, the party has a right in putting himself upon his guard, not only to consider the present acts, but to give character to those present acts through the medium of the antecedent threats. That is the law, and the object of the law in admitting that kind of evidence. So you are to examine this evidence with a view to see, first, whether there were such threats; secondly, whether they were made at a time and under circumstances that would justify the prisoner in the conclusion that his life was in danger, there being present such incidents as led his mind to apply the threats to the case; and, lastly, whether those threats affected his life or some other life, and that other life was so intimately connected with him that he might expect that they would be carried out upon him as well as upon the person more particularly affected. Now, it is said, on the part of the defense, that in this series of letters are to be found threats which would justify the conclusion to

which it is claimed this young man arrived at the time; that his life was in real danger, or that he had a right to apprehend such danger.

First, then, we are to consider what were the threats that had been made. Those threats are couched in letters written by the deceased. I do not now recollect any threats touching the prisoner proved to have been made orally—that is, by word of mouth. Threats touching the mother were made to her personally at various times, but I am now speaking of threats against the prisoner himself. Nor, indeed, is any letter produced here by the deceased to the prisoner. If my recollection serves me, no such letter is shown; but a series of letters to his mother (which may be grouped or classified by you for the purpose of ascertaining what they really amount to) have been produced and read. In several of those letters are contained threats of violence. under some circumstances, to the prisoner himself, as well as to the other children of the deceased. Now, those letters, in order to understand them properly and their just application to this case, I think, may be grouped into two series, and I shall, for the purpose of more clearly bringing to your minds what I wish to say, group them into the first and second series of letters. The first series were written in 1871—I am speaking now of the letters to the mother. If I have the number right there are six in all that have been read here before you, written in that year—letters addressed to the mother. They were all written in July, 1871, and they all relate (if I make a mistake on that subject of course counsel will correct me, and I shall be very glad to have it done) to the execution of certain papers which the writer claims Mrs. Walworth, by agreement or by arrangement between counsel in some form, was bound to execute. They are hideous letters—nobody can doubt that—full of oaths, full of obscenity (some of them, though some are destitute of that feature), and apparently most vulgar, dirty things; I cannot characterize them in any better terms than most vulgar, dirty things. But, in considering letters of that kind, you will consider, of course, what the writer is about and what he meant. You are to consider, in looking at those letters, what his object was. He made terrific threats if the papers

were not executed.  He made in some of the letters terrific threats without any condition.  Now, this man, in writing those letters—and I wish to say this of both series—committed an act in violation of law.  So far as the threats were absolute, undoubtedly he could have been arrested and bound over to keep the peace under the statute.  Any magistrate in the State is clothed with power to enforce that law against anybody who writes threatening letters.  Another statute provides that anybody who writes threatening letters for the purpose of compelling a party to pay or give money or part with property, shall be guilty of an attempt to rob, and shall be imprisoned in State prison for a period not exceeding five years.  I do not say that he was guilty of a violation of the latter statute, although one letter of one of these series seemed to approach it very closely indeed; but, at all events, these letters were the just and proper basis of a proceeding to put this man under bonds to keep the peace, or imprison him if he could not give those bonds.  They all related to the execution of a certain paper or certain documents in 1871.  They run from the 9th day of July to the 29th day of July, 1871, and then those letters ceased.

Now, if we turn to the document which was executed by Mrs. Walworth, we find that it bears date on the 29th day of July—29th or 30th, I am not sure which—in which she made certain agreements in respect to the alimony and support for herself and children provided for in the original decree; then the letters ceased for a long period.  No further letters seem to have been written (that have been produced here) to the mother until the following year, during a period to which I shall call your attention.  Now, those letters having that object in view, it is for you to determine whether the deceased really meant to execute the threats contained in the letters or not, or whether he really intended, by a series of vile, bragadocio letters and threats and annoyances, to drive his wife into the execution of the papers which he demanded at her hands, and when the execution of those papers was consummated, for the time being ceased the annoyances.  Did he intend to execute those threats, and did the parties believe that he intended to do so?  Did they have that effect upon their minds?  That

is altogether for you to consider, and you have a right to consider that those letters were written in 1871, all in the month of July. They all relate to the consummation of a particular thing. That thing was consummated, and the letters ceased. Bad as they were, they doubtless did not produce the act, because it appears in evidence that the delay was occasioned by the illness of Mrs. Walworth, and that her son kept back those letters, so that they probably had no effect upon her action at all; he kept back most of them until after she recovered. Yet the question is, what effect is to be given to those letters? Some weak-minded men think that they accomplish a purpose by writing brutal and threatening letters. I think I may characterize them (because I have received a great many of that kind of letters) as the offspring of cowards and fools, and you have the right to judge whether or not that kind of letters are likely to effect not alone what they demand, but are likely to produce fears that the persons capable of writing those letters are likely to execute the threats they contain. That is a just consideration here which has been suggested by counsel to your minds, and you have the right to take it into consideration. Now, if you go into the year 1872 for the second series of those letters, you will find that there are twenty of them. They were written between the 11th of July and the 17th of September. The last one bears a post-mark, and I think it is dated the 17th of September, 1872. Then all letters to the mother cease, so far as evidence before you goes, until the last unfortunate let-ter, received by the prisoner, that seems to have set him in motion for some object, on the 31st of May—an interval, you will observe, running from the 17th day of September, 1872, to the 31st of May, 1873, eight months and over—in which no letter given in evidence was written. Those letters were received by Frank, the prisoner, and mostly kept from his mother, who, of both series, says she never saw but five; I be-lieve—I think that is the number she gave—kept by him in his secretary, and for eight months before the time of the com-mission of this offense, those vile, threatening letters had ceased to come, so far as any evidence is given us in this case, until the last one came, on the 31st of May, 1873. If we look into

those letters for their characteristics, outside of their abominable profanity and blasphemy, we find that they generally relate to something touching the trust money. Mrs. Walworth says that beginning in the month of July, 1872, she received, in one or two installments, I think, the sum of $300. Now all these letters related to that trust money and to what seems to have been a fear in this man's mind that she was going to get the trust money and he was going to be left, as he tells it, to starve for the want of it, when he says he had given up his children for that money. He had, he says, sacrificed all his domestic ties, and surrendered his children to her. "Now," he says, "you are seeking to get that money," accompanied with vile epithets and terrible threats. It is for you to determine the effect of that class of letters probably had. Then there are other letters written to Chief Justice BARBOUR—three, I believe; two in 1871 and one in 1873—threatening him and the last threatening his wife for stories circulated by her about him and his conduct in relation to the family. Then two letters written to General Harden, I believe, are produced, and a letter written to Mrs. Backus, or Dr. Backus, is also produced, written in 1871. Those are the letters.

Now, in considering a question of that kind, you will bear in mind this fact: those letters come in masses upon us, upon you and me, and upon the community, in an avalanche. They are all read here by the learned counsel in tones of great force and eloquence, and come in a mass of vileness, filth, profanity, and every possible objurgation. I mention this fact because it is your duty, as it is always a juror's duty in considering subjects of this kind, to go back and place yourself where the parties were at the time. You are not sitting here to determine what effect such a mass of absurd, blasphemous and vile letters should have when thrown before the community in the form in which they are now presented to the public mind, as to the character of the writer, but you are to sit yourselves down in Saratoga, where these letters came in singles or doubles, as the case may be, as they actually did come, and to determine, not what effect as a mass they may have in judging of the character of the writer now when read here consecutively to us, but what

effect they had as they came through the mail, stretching over a period from the fore part of July, 1872, in the latter series, to the 17th of September, 1872, and in the former stretching from the 9th of July to the 29th, as they came dropping in one by one; what sort of an effect did they have upon the minds of those to whom they were addressed, is the true inquiry. Prolonged endurance tames the bold. And prolonged sufferings of this kind may possibly have some effect in the receipt of letters of this character, in determining their effect upon those to whom they are written. I throw out these suggestions because they are just ones, relating to your duties, to carry yourselves back to the time when those letters were written. And now with all their bad characteristics, the real point is whether they had the effect, as threats, to put the mind of the prisoner into that condition that when he saw his father at that interview, and saw him do all that he describes, after he had taken his seat in the chair, his mind gathering in this cloud of threats, really believed that his father was about to execute them by destroying his life. That is the point, and all the point there is about it. You remember, gentlemen, for you cannot fail to recollect, in contemplating these letters, what I said about the character of the writer and its just effects. That applies equally to the letters. The writing of letters of this character, although it may be a criminal offense, is not a capital offense. A party who receives letters, however insulting, has not the legal right to commit an assault in consequence of it. Assault and battery cannot be justified by the most opprobious and abusive words; and whether those words are oral or written, the law will not justify the party who receives them in inflicting personal chastisement even, upon the writer. It does, this, however: it will entitle him to show the fact of the letters being received in mitigation of damages in a civil action, and in mitigation of punishment in a criminal action. But they do not even stand in law as a justification of a criminal assault and battery, much less of a capital offense; and however wicked and brutal and cruel, the writer had not forfeited his life because he had penned them; nor had the party who received them, nor any friend of his, been clothed by law with power to pass sentence

of death and execute the sentence because of the character of those letters. They are legitimate here, as evidence bearing upon the effect of their threats, and the effect upon the mind of the accused in respect to the other subject-matter to which I shall soon call your attention. Beyond that they have no legitimate bearing. You will consider them in that light; you will act upon them in the light of just rules, which ought to be applied, and without which society cannot be protected under the laws.

Mr. O'CONOR—Your honor does not mean at this stage to take back what you said some time ago, that the influence upon this young man of those threats to excite his fears was fairly before the jury.

The COURT—I have just said that that is the one legitimate bearing of the letters. That is the only legitimate consideration on this branch of the defense; not as a justification, not in any sense approving the act of killing, but simply as bearing upon the question whether or not he, having read those letters, had a right to believe that his father was about to inflict the great bodily violence that the statute means, so that he could shoot him and be justified.

Now, gentlemen, I come to the question of insanity, as introduced in this trial. Insanity, to constitute a defense in a criminal case, is now clearly and well settled under the law of this State. I shall be governed, as I hope you will be, by the clear exposition of the law on this subject made by the court of last resort, and you will not take the law on this subject, although that is your duty to do, from the court now sitting before you, but you will take it from the higher court as presented through the humbler representative of justice. The learned counsel read before you some extracts from writers which, in my judgment, did not represent, and I felt bound to say so at the time, the law of this State touching the excuses against crime of an insane condition of the party committing criminal acts. What was read from the writings of Jeremy Taylor is not the law of the State of New York. And what was read from that distinguished Dominican friar of the thirteenth century, whose name does not now occur to me, who

was writing upon purely theological views of the sin of criminal acts, is not the law of this State. He was undertaking to express—being a great and wise and good man, as I have no doubt he was—his views or the supposed views of that Being who is capable of judging from the thoughts of the hearts of men, rather than from that limited scope which human beings must apply, to be gathered from their acts. On the subject of insanity, the courts of this State have laid down with great distinctness the law to which I shall now call your attention; and that I may make no mistake on the subject, I shall read to you, from a certified opinion of the Court of Appeals, what I intend to charge you as to what is the law of insanity in this State. This opinion was pronounced in a case of murder. The court below on the trial had charged that to establish a defense on the ground of insanity it must be clearly proven that, at the time of committing the act, the subject of the indictment, the party accused, was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, and, if he did know it; that he did not know he was doing wrong; and to this part of the charge the prisoner, by his counsel, excepted. The court says: The part of the charge excepted to was in the language employed by TYNDALL, chief justice, in the response of the English judges to the question put to them by the House of Lords as to what instruction should be given to the jury in the trial of a prisoner charged with crime, when the insane delusion of the prisoner at the time of the commission of the alleged act was interposed as a defense. All the judges except, one concurred in the opinion of TYNDALL, chief justice, and the case is of the highest authority, and the rule declared in it has been adhered to by the English courts. One of the judges gave a separate opinion, in which he laid down, I might say, a much stronger rule against the party accused. In the case of the People *v.* Bodine, the language of TYNDALL, chief justice, was quoted and approved, and Judge BEARDSLY says:

"Where insanity is interposed as a defense to an indictment for an alleged crime, the inquiry is also brought down to the

single question of the capacity to distingui h between right and wrong at the time the act was done."

The rule was reaffirmed by the Court of Appeals in the case of the Willis *v.* People (32 *N. Y.*, 717), where the court says:

" It must be regarded as the settled law in this State that the test of responsibility for criminal acts, where unsoundness of mind is interposed as a defense, is the capacity of the defendant to distinguish between right and wrong at the time of, and in respect to, the act which is the subject of inquiry."

" We are asked, in this case, to introduce a new element into the rule of criminal responsibility in cases of alleged insanity, and to hold that the power of choosing right from wrong is as essential to legal responsibility as the capacity of distinguishing between them, and that an absence of the former is inconsistent with the presence of the latter. The argument proceeds upon the theory that there is a form of insanity in which the faculties are so disordered and deranged that a man, though he perceives the moral quality of his acts, is unable to control them, and is urged by some mysterious pressure to the commission of acts the consequence of which he anticipates but cannot avoid. Whatever medical or scientific authority there may be for this view, it has not been accepted by courts of law. The vagueness and uncertainty of the inquiry which would be open and the manifest danger of introducing the limitation claimed into the rule of responsibility in cases of crime, may well cause courts to pause before assenting to it. Indulgence in evil passions weakens the restraining power of the will and conscience, and the rule suggested would be the occasion for the commission of crime and its justification. The doctrine that the criminal act may be excused upon a notion of an irresistible impulse to commit it, where the offender has the ability to discover his legal and moral duty in respect to it, has no place in the law."

In another case, where the indictment was for poisoning, the defendant was alleged to act under some influence which he could not resist, and the court says: " Every crime is committed under influence of such a description, and the object of the law was to compel people to control those influences." Now, you

will see, gentlemen of the jury, that this case lays down a plain, clear rule in cases of insanity alleged as a defense against crime. It must be satisfactorily shown that the party, at the time of committing the act with which he stands charged, had not the capacity to understand what he was doing and know the consequences of his act, and know that it was wrong. In such a case he is excused, but if he had capacity sufficient in the judgment of the jury to know the legal and moral character of the act that he was doing, the fact that he alleges that he had not the control of his will in respect to it, but that his will was controlled by irresistible impulse, is no defense. The object of all law is the protection of society, its members, and its property, and in making laws upon this subject for the protection of society, the rule laid down by the court in the case I have quoted so largely from, is in my judgment the only one which is safe for the community. Physicians, scientists, and others may speculate upon diseases of the mind, but while they are carrying their speculations out to conclusions satisfactory to themselves, society is exposed to all sorts of crime by persons falling within such speculation; but the law does not give them protection, and although it has been held in some cases that "irresistible impulse" is a defense against crime, it is not so in this State. No party is excused unless he is laboring under a disease, the manifestation of which is some form of insanity, which insanity, by the influence of the disease, has reached the stage which deprives him of the power of judging as to the nature and equality of the act or its consequences. So long as that power remains he must not do the act, if he would escape the consequences of the crime. If A deliberately draws a pistol, and cocks it, and points it at your breast, and discharges its contents into your body, and alleges his insanity as a defense, the inquiry is, did A know, when he cocked and fired that pistol, and discharged its contents into your body, that the act was one that might and would probably destroy your life, and did he know that the act was forbidden by law? If he had the capacity to know those two things, no jury can justly excuse him on the ground of insanity. Such is the law as it is laid down in the Court of Appeals to which

I have now called your attention. Applying the rule to this case, the question is, whether the prisoner has shown you that, by reason of an approaching disease that had seized upon him, the disease of epilepsy, and which, according to the evidence here, I feel bound to say, you will be justified in finding was. to a certain degree, upon him prior to the commission of this alleged crime, whether that disease had so affected his mind that when he shot his father he did not know that he was doing a wrong act, or did not know that he was doing an act that would kill him or injure him.

I cannot stop, gentlemen, to go over the evidence upon that subject. You have heard what it was. You have heard the nature of his attacks, the extent to which they had affected him, what violence he had perpetrated before, and if, upon looking at that, you can see satisfactory evidence that his mind had been so far destroyed as a consequence of the insanity produced by epilepsy, that he did not fairly come within the rule of responsibility given by the Court of Appeals, then the law excuses him. An insane man cannot commit a crime. I mean by that, that an insane man within the law cannot commit a crime. The statute says he shall not be tried for the crime if he be insane. We have an express statute in this State on that subject, and common sense and common humanity dictate that no man really insane should be convicted, if tried for an act, the nature and quality of which disease has rendered him incapable of comprehending, so that he has not capacity to know whether it be right or wrong, or that its consequences will be productive of injury. In such a case, it is the duty of a jury to acquit. But where it appears by the whole evidence in the case, when fairly considered by the jury, that his condition is within the rule of responsibility laid down by the Court of Appeals, then he is amenable to the law for his acts, as is any other party. If his condition is such that it does come within that rule, it is not the subject-matter of defenses in court, although there may be circumstances attending it which may properly be considered by that authority in whom is reposed the pardoning power of the State.

Now, gentlemen, I have said all I desire to upon that sub-

ject. You are to take this case and consider it. You are to give it your painstaking and patient consideration. You have the right to look at it in view of all surrounding circumstances. You have a right, in considering the weight of the evidence in the case, to be governed, to a certain degree, by the consequences to the accused, because those consequences render it highly important that you should consider the whole case fully and fairly, and carefully determine what is the truth. All you sit there for is to answer a question of fact, or a few questions of fact. It is not a true idea that you have any responsibilities, personally, beyond the answering of those questions which are replied to in a verdict of guilty or not guilty. It is the law that adjudges the consequences. It is the prisoner, when guilty, that has brought those unhappy consequences upon himself and upon his family. It is one of the misfortunes of this world that when a man commits a crime, its consequences are not limited to himself. They radiate in a wider circle, and touch, possibly, a thousand hearts besides his own; and yet society has a right to arraign him, try him, and, if guilty, convict him, and the unhappy consequences to others are not to be considered where the proof is clear that a party is really guilty. You will take this case and give to it your earnest and complete consideration. Give the benefit to the prisoner of every reasonable doubt, not only upon the whole case but upon its various branches, and if you come to the conclusion that the people have not satisfactorily established the case in any of the particulars required to be proved, under the presumption of the law that all persons are innocent until proven guilty, it is your duty to acquit the accused; but if you are satisfied that the guilt is established, then it is your duty, regardless of consequences, to pronounce a verdict of guilty.

There were some special requests which were read in your hearing, upon which it is my duty to make some remarks.

Mr. O'CONOR—In reference to those special requests, I have marked those that I consider that you have refused to give, and we except [handing the list to the court].

The COURT—I am asked to charge you, gentlemen, that "if one of the four shots was fired accidentally, and without con-

sciousness on the part of the accused, or an intent to fire it, then, however, the accused may be chargeable with negligence or want of care, the jury should still inquire whether there was satisfactory proof that the death was produced by the other shots, or any of them. On this point, as in all other respects, the accused is entitled to the benefit of any doubt as to the fact. If the jury is not satisfied that the death was caused by the other shots, not by the shot so fired accidentally, unconsciously, or unintentionally, they cannot lawfully convict the accused of murder in either degree. Upon that point I desire to say that all it is predicated upon, if I recall it rightly, is the statement of the accused before the coroner that he was not conscious of firing but three shots; and in his statement to the officer at the station-house, in which he described the occurrence as having fired three shots.

Mr. O'Conor—I think the statement of the young man Barrett must be regarded as a mistake on the part of Mr. Barrett. Mr. Barrett says that under his dictation he wrote a telegram, and that telegram was: "I have shot father; take care of mother." We produced the original telegram written at the moment by this Mr. Barrett, identified by him as his own handwriting, and it says: "I shot father three times." I assume that the fair and just view is not that Mr. Barrett has willfully misstated anything, but that the statement made to him and the statement in the telegram were the same.

The Court—The point of the request is, that if the deceased was killed by the shot, of which the prisoner has no recollection, there is no crime, because he was unconscious of having fired that shot, or that that shot may have been accidental. It is for you to say, gentlemen, whether all that the statement amounts to is not that the prisoner firing his revolver as rapidly, according to the testimony, as it could be cocked and fired, has no recollection of the number of times he actually fired. There is no question but that four shots were fired into the body of the deceased; there is no question that the prisoner fired all four of them, and if, in the excitement of the moment, he did not keep correct count of the number of shots fired, it does not make any difference as to the consequence to himself. If

either one of those four shots was fired under the circumstances stated here, and you find the other facts that justify a verdict of murder, it will be your duty to convict him, notwithstanding he did not recollect or was not conscious after he got through that it was four instead of three.

Mr. O'CONOR—Your honor refuses to give the charge which I ask you to give?

The COURT—Yes, sir, I do.

Mr. O'CONOR—I will take an exception.

The court also refused to give the next charge indicated b Mr. O'Conor on his list, to which counsel for defendant excepte ;

Mr. O'Conor called the attention of the court to the last sentence in the letter to Clarence Walworth, as to the meaning and grammatical construction of the clause, " I will be heartily sorry if I shall have caused you any trouble or expense."

The court said he would leave its construction to the jury.

The COURT—Gentlemen, I have only one word to add, and that is this: If you agree upon a verdict of guilt in the first degree in this case, you will put your verdict in that form, specifying the degree. If you agree upon a verdict of murder in the second degree, you will also specify the degree. If you agree upon a verdict acquitting the prisoner on the ground of self-defense, you will render a general verdict of not guilty; upon the ground of insanity, you will specify that in your verdict as the ground.

Mr. O'CONOR—Does your honor mean to say that the jury are bound to include in their verdict that they find it upon the ground of insanity?

The COURT—I request them to do so. I do not charge that they are bound to do it.

The jury found the prisoner " guilty of murder in the second degree," and on July 5, 1873, he was sentenced by the court to "imprisonment in the State prison at hard labor for the full term of his natural life."

NOTE.—This case is inserted in pursuance of the policy of giving, from time to time, important decisions rendered prior to the commencement of the present series, and which have not been reported. The celebrated charge of Judge DAVIS, in the Walworth case, although constantly cited in the points of counsel, has never been reported, and is here given in full.